IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| DANIEL GLEN WHITE § | |
| § | |
| § | CIVIL ACTION NO. G-03-936 |
| V. § | |
| § | |
| § | Pursuant to Rule 9(h) of the |
| PGS EXPLORATION (U.S.), INC. § | Federal Rules of Civil Procedure - |
| VELODYNE SHIPPING LTD., § | Admiralty |
| and *'M/V FALCON EXPLORER"* in rem § | |

**FINDINGS OF FACT AND CONCLUSIONS OF LAW**

This case arises from an alleged maritime personal injury occurring on September 30, 2002, while Plaintiff Daniel Glen White ("White" or Plaintiff) was employed as a member of the crew of the M/V Falcon Explorer. Plaintiff originally asserted additional claims against PGS Americas, Inc., Velodyne Shipping Ltd., Sea Bird Management A.S. and the M/V Falcon Explorer, *in rem*. Prior to trial, Plaintiff voluntarily dismissed Sea Bird Management A.S., and all claims against that Defendant are consequently **DISMISSED WITH PREJUDICE**. In Plaintiff's First Amended Complaint, he also dropped any claims against PGS Americas, Inc. and all claims against that company are therefore also **DISMISSED WITH PREJUDICE**. During the course of trial, Plaintiff elected not to present any evidence against Velodyne Shipping Ltd. or the M/V Falcon Explorer, *in rem*, and the Court found that as a matter of both fact and law, Plaintiff had failed to state any viable claims against these Defendants, and consequently, as heretofore Ordered, all claims against Velodyne Shipping Ltd. and the M/V Falcon Explorer, *in rem*, are further **DISMISSED WITH PREJUDICE**. Therefore, this matter proceeded to a non-

jury trial, Honorable Samuel B. Kent presiding, on January 18, 2005, against the sole remaining Defendant, PGS Exploration (U.S.), Inc. ("PGS" or Defendant).

Essentially, Plaintiff White alleges that on September 30, 2002, he was injured in the course and scope of his employment as a member of the crew of the M/V Falcon Explorer while performing duties associated with the routine, scheduled fire drill. He claims injuries to his right shoulder and consequent damages. Defendant vigorously contests both liability and the nature and extent of Plaintiff's injuries and/or damages, if any. Having carefully considered all of the pre-trial pleadings on file herein, the comprehensive Pre-trial Order and related documents kindly submitted by respective excellent counsel, all of the trial testimony and evidence, during the course of which the Court carefully made relevant and necessary credibility assessments, the arguments and oral offerings of respective counsel, the comprehensive post-trial submissions by each side, and relevant statutory and case law pertaining to this cause, the Court hereby enters its Findings of Fact and Conclusions of Law, as herein provided.

## FINDINGS OF FACT

1. Plaintiff Daniel Glen White was born on April 2, 1969 and is currently 36 years of age. He graduated from high school, and pursued substantial welding education in night school over the ensuing 5 ½ years. He is well qualified in both the execution or supervision of and teaching of sophisticated welding techniques. He is divorced, but provides support to two (2) minor daughters. He was born on a farm in West Texas and grew up in that environment. He has worked with his hands virtually all of his adult life. He has had a well

rounded and varied employment background, and appears to be a bright, articulate, well-motivated individual.

2. Plaintiff recalled having passed a pre-employment physical with a prior employer, in 1995, and several pre-employment and periodic physicals while employed with PGS. All were provided by his family doctor, a Dr. Miller. These were routine, cursory exams, but none showed manifesting problems with his right shoulder. White began working for PGS in 1997, and continued until the date of his alleged injury, September 30, 2002.

3. The M/V Falcon Explorer is a seismic vessel. It provides exploration services for the offshore petrochemical production industry. At the time of Plaintiff's alleged injury, the vessel was en route from the Shetland Islands to the Gulf of Mexico. Several members of the crew were engaged in a routine, standard fire drill aboard the vessel, near the Bahama Islands in the Atlantic Ocean. The vessel had a navigational crew and a seismic crew aboard at the time. Plaintiff was in the seismic crew. On the date in question, he was assigned to Fire Squad No. 2, which consisted of a Party Chief, a Chief Mechanic, a Ship Leader Mechanic, a First Mechanic, a Second Mechanic, a Chief Observer, and a Chief Navigator. Plaintiff was the First Mechanic. Plaintiff asserts negligence on the part of PGS, pursuant to the Jones Act, 46 U.S.C. § 688. Jurisdiction is not disputed, and venue is proper. This matter is therefore properly considered by the Court, pursuant to relevant statute, under its admiralty jurisdiction. See FED. R. CIV. P. 9(h).

4. Fire drills are extremely important on board seismic vessels, and are routinely conducted. They are obligatory for all members of the crew. Drills were conducted at least once every "hitch", which in Plaintiff's case (five weeks on/five weeks off), meant at least once every

five (5) weeks.  Plaintiff conceded that he has participated in dozens of such fire drills and is thoroughly familiar with the relevant procedures and execution.  On each crew change, the Master of the vessel is obligated to clearly establish the duties of each member of a fire crew.  A Station Card is prepared and posted on the bridge of the vessel so that each crew member can, upon reporting to the vessel, ascertain his duties in the event of a fire, or fire drills, and everyone is given a particular job to do, under close and specific supervision.  Such drills, and relevant knowledge thereof by each member of the crew, are vital to the safety and security not only of the vessel but each crew member.

     5.     On the date in question, Plaintiff was assigned to Fire Squad No. 2.  This was manned by seismic crew personnel.  During the drill in question, this squad was assigned the task of the simulated extinguishing of a fire in the Technical Room adjacent to the Gunshack on the vessel.  This area is located in an interior portion of the vessel near the stern, in the area where seismic work occurred on the back deck. Each member of this fire squad understood that they were to muster at a hydrant located on the aft port side of the vessel on the stern weather deck, in the area where they regularly worked.  Plaintiff and Leonard "Jody" Lacroix were assigned as "smoke divers" or firefighters who were required to actually don firefighting protective equipment and manually take the fire hose to the area of the simulated fire.  Fellow squad members Neil Aitken and Ken Horton were assigned to assist the smoke divers, and squad leader Arnie Kvalsvik was assigned to coordinate the activities of all of these individuals.  Still another crew member, Peter Mackinnon, was required to maintain radio contact with the bridge and to relay any unique instructions to the fire squad for its use during the drill.

6.	During the course of the drill, Plaintiff and Lecroix donned their firefighting equipment, which consisted of a helmet, face shield, heavy flame-retardant clothing, boots, gloves, and a self-contained breathing apparatus.  As the head smoke diver, Plaintiff was required to lead off and communications with him were maintained by means of a lanyard (rope) tied around his waist, which could be tugged to obtain his attention.  The Court specifically notes that while this is cumbersome equipment which necessarily limits rapid, spontaneous movement, and the ability to maintain significant peripheral vision, Plaintiff's vision was unobstructed, as this was a drill only.  There were no smoke, flames, or other vision impediments.  The testimony was unclear as to the hearing capability of squad members wearing the gear, but there is no question that communication was effective by means of the lanyard.  The smoke divers were to take hold of a fire hose, and proceed towards the site of the simulated fire.  However, the hoses were not charged with water, and were consequently limp and somewhat pliable.  All hoses aboard the vessel are 15 meters in length.  It is highly disputed as to whether one or two hoses were hooked up, but as the fire simulation point was well beyond 15 meters away from the start point, two hoses would have been required to reach it.

7.	Plaintiff testified that as he entered the interior of the vessel, through a watertight doorway, and proceeded toward the fire simulation point, he and Lacroix proceeded down a hallway and had to make a 90 degree right turn around a corner, to reach their objective.  Plaintiff testified that he proceeded at a "fast pace", which the Court understands to be a moderate to brisk walk. Plaintiff testified that as he rounded the corner, with visibility behind him therefore obscured, all slack went out of the hose, causing his right arm to jerk, as a result of which he felt

a sharp pain in his right shoulder, and dropped the hose. He cannot recall whether or not, after his injury, the drill was completed. His participation in it stopped immediately upon the alleged injury to his shoulder. However, of significance, fellow smoke diver Lacroix testified that he did not recall running out of hose or any jerk on the hose. In fact, it was his recollection that the drill was routinely completed, which is substantiated by log entries made by the Master in the vessel's Deck Log. Indeed, on cross-examination, Plaintiff conceded that if one of the fire crew had stopped in the middle of a drill, it would have been a highly unusual occurrence and there would have been an investigation as to why, which would have been significantly documented. Plaintiff offered no such documentation in trial. Plaintiff further conceded that he was not warned by means of a tug on the lanyard that he was running out of hose, or that there was any other problem related to either the hoses, the connections, or the length of the hose, that would have or in fact did create any problems. All he can remember for sure is that he felt a sharp jerk on the hose, and a consequent pain in his right shoulder. He promptly reported this injury to his fellow fire squad members.

8. In the Court's respectful opinion, a stunning lack of communication occurred throughout the fire drill, regarding the number of hoses involved, the actual length of hose to be played out, and the condition of that hose as it unraveled in the hands of the smoke divers. Having carefully considered the testimony of all relevant personnel, the Court finds that Plaintiff was injured as alleged, sustaining a sharp jerk to his right shoulder, causing consequent pain. However, the Court finds Plaintiff fifty percent (50%) negligent for not ascertaining how much hose he would be working with, and its condition, prior to entering into a simulated emergency

situation, and the Court finds his fellow fire squad members fifty percent (50%) negligent for failing to tug on his lanyard to advise him that he was running out of hose.

9.      Plaintiff reported his injury to the medic on board the next day, and filled out an accident report. He remained aboard the vessel for the rest of his hitch, or about two weeks, but did no further physical work. He reported promptly to a shoreside doctor when he returned home, and subsequently has had two (2) surgeries to his right shoulder, as well as substantial physical therapy, medication and home therapy. He still has pain and significant limitations of motion and strength in his right shoulder, and has been permanently limited to light duty. He will require episodic and analgesic medical treatment for the rest of his life, but this should only require medication, periodic physical therapy, and medical monitoring.

10.     The Court notes that Defendant vigorously contests whether this injury occurred at all. In that regard, the Court has carefully considered the testimony of fellow smoke diver Lacroix, that he felt no jerking on the hose and did not recall any significant event. On the other hand, the Court has equally carefully considered that Plaintiff worked for Defendant for several years, was a well liked, competent and consistent worker, and that Plaintiff has absolutely no motivation based on any evidence presented at trial, to malinger, fabricate an injury, or terminate a lucrative career. In fact, since at the time of the injury, Plaintiff was earning in the low $40,000 dollar range only with a high school degree indicates to the Court that Plaintiff had considerable motivation to remain with a job that he liked and did well. Therefore, the Court, having very carefully balanced the credibility and motivations of all relevant witnesses, finds that the accident did occur, subject to the liability apportionment set out above.

11.     Plaintiff presented the testimony of his two treating physicians, Dr. Gerhard Maale, III, and Dr. Praveen Reddy.  Both are obviously extremely bright and well qualified physicians.  Dr. Reddy was Plaintiff's primary treating physician, and Dr. Maale consulted as a musculo-skeletal oncologist.  Essentially, their collective diagnosis was a labral tear which exacerbated and severely aggravated a hemmorhagic pseudo tumor.  There is considerable dispute in relevant medical literature, as to whether such hemmorhagic pseudo tumors are caused by trauma or osteoarthritis.  In Plaintiff's particular case, it was determined that Plaintiff had a cyst in his suprascapular notch, which impinged on the suprascapular nerve, resulting in palsy to his right shoulder and a marked decrease in strength and dexterity in his right arm.  This foreign entity was surgically removed and the torn labram repaired.  Microscopic examination of biopsy tissue indicated that Plaintiff had microscopic osteophytic cell formation indicating at least some pre-existing aspect to this problem.

Noting that Defendant is only liable to the extent of injury actually caused, the Court finds that Plaintiff's problems were twenty-five percent (25%) pre-existing, and seventy-five percent (75%) caused by the alleged injury of September 30, 2002.  In this regard, the Court particularly notes the well reasoned testimony of Dr. Maale, that it is simply impossible to precisely determine the age of such a cyst.  He testified that it could have been there for years, or for a month, but there was at least, in his opinion, a fair chance of some pre-existing problem.  He testified, consequently, that only part of Plaintiff's problem related to the alleged injury.  Dr. Reddy also carefully testified that the labral tear was a contributing factor to either the creation or expansion of the cyst, and consequent impingement on the suprascapual nerve, but that clearly a

pre-existing cyst may have been aggravated by the injury. He expressly testified that the event could "possibly" have caused the injury, but that it was not a common cause of this sort of problem. Nevertheless, he also relates at least a part of the problem to the injury. On the basis of the careful testimony of both doctors, the Court finds the above contribution to Plaintiff's present problems, arising from this injury, notwithstanding pre-existing latent problems. Both doctors have released Plaintiff to permanent light duty.

12. The Court carefully considered the testimony of Defendant's rebuttal orthopaedic surgeon, Dr. Richard S. Levy. Dr. Levy is a board certified orthopaedic surgeon, and is obviously very bright and articulate. However, he unequivocally stated that absolutely none of the problems Plaintiff sustained had anything to do with his injury, and to the extent Dr. Malle and Dr. Reddy said they did, they were flatly wrong. Notwithstanding Dr. Levy's impressive credentials, the Court simply does not find this testimony persuasive. Dr. Levy was paid $12,000 to do nothing more than review records and testify at trial. He was not a treating physician, and has very limited experience with hemmorhagic pseudo tumors. As a result, after having carefully balanced the testimony of all three physicians, the Court expressly finds, as above noted, that seventy-five percent (75%) of Plaintiff's current problems arose from his injury of September 30, 2002.

13. Plaintiff presented Mr. Joseph Kramberg as a vocational rehabilitation expert. Defendant rebutted with the testimony of Mr. William Quintanilla. Both of these individuals are extremely well known to the Court, having testified before the Court on numerous occasions in the past. The Court finds the testimony of both, while somewhat inconsistent, to be credible and

helpful. Essentially, the consolidated picture of the testimony of both of these well known and highly qualified rehabilitation experts, is that Plaintiff tested with some limitations in spelling and other reading-related skills, but that he is a well motivated, hard working, skillful and resourceful worker. He has extraordinary experience, knowledge and ability in the field of welding, and could be employed as a welding instructor, supervisor or foreman. He is also adaptable to other fields, having enjoyed a very varied work background, including growing up on a farm, where it is necessary for one to be a "Jack of all trades". The Court therefore finds that although Plaintiff has been limited to light duty for the rest of his life, and is clearly unable to return to his prior occupation as a crew member on a seismic vessel, he nevertheless retains significant shoreside earnings capability, which over time should return him to near the same earnings capability that he enjoyed in his maritime employment.

14.     Based on Plaintiff's trial testimony, Plaintiff's economic expert's testimony, and the relevant documentation submitted pertaining to his earnings, the Court finds that Plaintiff had a net earning rate of about Forty Thousand and 00/100 Dollars ($40,000.00) per year, as of the time of his injury. Between September 30, 2002, and the date of trial, mid-January 2005, Plaintiff was off approximately two and one-third (2 1/3) years. He has not worked since the date of accident. He has been released to light duty, but has yet to secure employment. Consequently, he has suffered an earnings loss for two and one-third (2 1/3) years, in the past, totaling a theoretical wage loss of Ninety-three Thousand Two Hundred and 00/100 Dollars ($93,200.00) plus, according to unrebutted economic testimony, a fringe economic loss of fifteen percent (15%) of that amount, or Thirteen Thousand Nine Hundred Eighty and 00/100 Dollars

($13,980.00).  This totals a theoretical past economic loss of One Hundred Seven Thousand One Hundred Eighty and 00/100 Dollars ($107,180.00).  However, only seventy-five percent (75%) of this is attributable to the injury, or Eighty Thousand Three Hundred Eighty-five and 00/100 Dollars ($80,385.00).  As Defendant is only fifty percent (50%) liable as regards such past loss, Defendant is therefore liable to Plaintiff for past economic loss of Forty Thousand One Hundred Ninety-two and 50/100 Dollars ($40,192.50).  Plaintiff was paid maintenance, but this is not an offset credit.  Past medical bills have all been paid.  Consequently, the Court finds Defendant liable to Plaintiff for that portion of his aggravated injury economic losses caused by the Defendant, in the past, of Forty Thousand One Hundred Ninety-two and 50/100 Dollars ($40,192.50).

15.    The Court finds that in order for Plaintiff to rehabilitate himself, undergo necessary work hardening and find and re-enter suitable employment will take an additional eighteen (18) months.  Using the average net earnings rate of $40,000.00 per year, plus fifteen percent (15%) benefit loss, but adjusted for Plaintiff's pre-existing condition, and Plaintiff's contributory negligence, the Court finds that Plaintiff will sustain additional future economic losses, in the immediate future of Twenty-five Thousand Eight Hundred Seventy-five and 00/100 Dollars ($25,875.00), for which Defendant is liable.

16.    Thereafter, the Court sincerely believes, and finds, that Plaintiff will rapidly accelerate his earnings capability, given his background of a lifetime of hard work, diligence and perseverance, to an area roughly near what he was earning at the time of injury.  Assuming a residual earnings and fringe benefit capacity, in terms of net wages, of roughly $35,000.00 per

year, versus the $40,000.00 per year he was earning previously, the Court finds that a $5,000.00 per year loss, over his work life expectancy, after eighteen (18) months from trial, of roughly 23.5 years, but adjusted for his pre-existing condition and contributory negligence, would be Forty-four Thousand Sixty-two and 50/100 Dollars ($44,062.50), for which the Court finds Defendant liable.

17. The Court further finds that Plaintiff's subjective losses, including pain and suffering, physical impairment and the like, are One Hundred Thousand and 00/100 Dollars ($100,000.00), past and present, inclusive. This amount roughly approximates slightly less than his economic losses. Discounting such for Plaintiff's pre-existing problems and contributory negligence, the Court finds Defendant liable for Thirty-seven Thousand Five Hundred and 00/100 Dollars ($37,500.00).

18. The Court further finds, based upon testimony offered at trial, that Plaintiff will have future medical expenses of no more than Five Hundred and 00/100 Dollars ($500.00) per year. Taking Plaintiff's age to 72, this would equal Eighteen Thousand and 00/100 Dollars ($18,000.00) in future medical expenses. Again adjusting for pre-existing problems and Plaintiff's contributory negligence, this amount equals Six Thousand Seven Hundred Fifty and 00/100 Dollars ($6,750.00), for which Defendant is liable.

19. Consequently, the Court finds, having adjusted for Plaintiff's pre-existing problems and his contributory negligence, that Defendant is liable to Plaintiff in the total amount of One Hundred Fifty-four Thousand Three Hundred Eighty and 00/100 Dollars ($154,380.00).

**CONCLUSIONS OF LAW**

1. Plaintiff was a Jones Act seaman and a member of the crew of the M/V Falcon Explorer, at the time of his injury on September 30, 2002. Defendant is liable to Plaintiff for that portion of his injuries caused or contributed to by the negligence of Defendant, but only to the extent of Defendant's negligence. *Rogers v. Missouri Pacific R. Co.*, 352 U.S. 500, 506, 77 S. Ct. 443, 448.

2. The Court concludes that seventy-five percent (75%) of Plaintiff's injuries and consequent damages were caused as a result of Plaintiff's injury of September 30, 2002, and further concludes that Plaintiff and Defendant each bear fifty percent (50%) liability for those injuries and consequent damages. Adjusting for pre-existing problems, and Plaintiff's contributory negligence, the Court concludes that Defendant is liable to Plaintiff in the net adjusted amount of Forty Thousand One Hundred Ninety-two and 50/100 Dollars ($40,192.50) for past economic losses, Twenty-five Thousand Eight Hundred Seventy-five and 00/100 Dollars ($25,875.00) for immediate future economic losses, Forty-four Thousand Sixty-two and 50/100 Dollars ($44,062.50) for lifetime economic losses, Thirty-seven Thousand Five Hundred and 00/100 Dollars ($37,500.00) for subjective losses, and Six Thousand Eight Hundred Fifty and 00/100 Dollars ($6,850.00) for future medical expenses, or a total of One Hundred Fifty-four Thousand Three Hundred Eighty and 00/100 Dollars ($154,380.00).

3. To the extent that any Finding of Fact constitutes a Conclusion of Law, it is hereby adopted as such. To the extent that any Conclusion of Law constitutes a Finding of Fact, it is adopted as such.

Pursuant to FED. R. CIV. P. 52, these Findings of Fact and Conclusions of Law are hereby adopted and issued by the Court, and made a part of the record of these proceedings, this the _____ day of April, 2005.

_____
SAMUEL B. KENT
UNITED STATES DISTRICT JUDGE

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
GALVESTON DIVISION

| | |
|---|---|
| DANIEL GLEN WHITE § | |
| § | |
| § | CIVIL ACTION NO. G-03-936 |
| V. § | |
| § | |
| § | Pursuant to Rule 9(h) of the |
| PGS EXPLORATION (U.S.), INC. § | Federal Rules of Civil Procedure - |
| VELODYNE SHIPPING LTD., § | Admiralty |
| and 'M/V FALCON EXPLORER" in rem § | |

## FINAL JUDGMENT

On the basis of the Findings of Fact and Conclusions of Law this date adopted and issued entered herein, it is hereby

**ORDERED, ADJUDGED and DECREED** that Plaintiff Daniel Glen White shall have and recover of and from Defendant PGS Exploration (U.S.), Inc., the sum of One Hundred Fifty-four Thousand Three Hundred Eighty and 00/100 Dollars ($154,380.00), together with post-judgement interest at the rate of 4.25% per annum, until said Judgment is satisfied.  Let execution issue if not timely paid.  All claims heretofore asserted herein, by Plaintiff Daniel Glen White, against Defendants PGS Americas, Inc., Velodyne Shipping Ltd., Defendant Sea Bird Management AS and against M/V Falcon Explorer, *in rem*, are **DISMISSED WITH PREJUDICE**.

**THIS IS A FINAL JUDGMENT**.  Any relief not herein expressly granted is **DENIED.**

**DONE** at Galveston, Texas this the 25th day of April, 2005.

_____
Samuel B. Kent
United States District Judge